Exhibit "A"

1 | Bibianne U. Fell, Esq. (SBN 234194)
Marlee A. Horwitz, Esq. (SBN 340729)
2 | **FELL LAW, P.C.**
*Mailing:* 11956 Bernardo Plaza Dr., Box 531
3 | San Diego, CA 92128
*Personal Service:* 5677 Oberlin Dr., Suite 204
4 | San Diego, CA 92121
Telephone:  (858) 201-3960
5 | Facsimile:   (858) 201-3966

6 | **FEDERMAN & SHERWOOD**
William B. Federman
7 | 10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
8 | Telephone: (405) 235-1560
wbf@federmanlaw.com
9 | (*pro hac vice* application forthcoming)

10 | **MURPHY LAW FIRM**
A. Brooke Murphy
11 | 4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
12 | Telephone: (405) 389-4989
abm@murphylegalfirm.com
13 | (*pro hac vice* application forthcoming)

14 | *Attorneys for Plaintiffs*

15 | ## SUPERIOR COURT OF THE STATE OF CALIFORNIA

16 | ## FOR THE COUNTY OF SAN DIEGO – COMPLEX CIVIL

| | |
|---|---|
| DANIEL BLANCO and RAFAEL BLANCO, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiffs, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF: |
| v. | |
| DIALAMERICA   MARKETING,   INC., | 1.  NEGLIGENCE; |
| | 2.  BREACH OF IMPLIED CONTRACT; |
| Defendant. | 3.  UNJUST ENRICHMENT; |
| | 4.  NEGLIGENCE PER SE; |
| | 5.  CALIFORNIA UNFAIR COMPETITIONLAW, CAL. BUS. & PROF. CODE §§ 17200, *et. seq.* |
| | JURY  TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

Plaintiffs DANIEL BLANCO and RAFAEL BLANCO ("Plaintiff" or "Plaintiffs") brings this Class Action Complaint against DIALAMERICA MARKETING, INC. ("Defendant" or "DialAmerica"), in their individual capacities and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1.      This class action arises out of the recent data breach ("Data Breach") involving Defendant DialAmerica, a for-profit call center outsourcing services company headquartered in Mahwah, New Jersey.

2.      DialAmerica failed to reasonably secure, monitor, and maintain Personally Identifiable Information ("PII") provided by current and former employees, including, without limitation, full names, addresses, Social Security numbers, and employee assigned identification numbers of individuals stored on its private network. As a result, Plaintiffs and other impacted individuals suffered present injury and damages in the form of identity theft, loss of value of their PII, out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the unauthorized access, exfiltration, and subsequent criminal misuse of their sensitive and highly personal information.

3.      Moreover, after learning of the Data Breach, Defendant waited nearly nine months to notify Plaintiffs and Class Members of the Data Breach and/or inform them that their PII was compromised. During this time, Plaintiffs and Class Members were unaware that their sensitive PII had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm.

4.      By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion. Defendant's conduct in breaching these duties amounts to negligence and/or recklessness and violates federal and state statutes.

5.      Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to take reasonable steps to protect the PII of Plaintiffs and Class Members and warn Plaintiffs and Class Members of Defendant's inadequate information security practices. Defendant disregarded the rights of Plaintiffs and Class Members by knowingly failing to implement and maintain adequate and reasonable measures to ensure that the PII of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use.

6.      As a direct and proximate result of Defendant's data security failures and the Data Breach, the PII of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party, and Plaintiffs and Class Members have suffered actual, present, concrete injuries. These injuries include: (i) the current and imminent risk of fraud and identity theft  (ii) lost or diminished value of PII ; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII; (vi) the invasion of privacy; (vii) the compromise, disclosure, theft, and unauthorized use of Plaintiffs' and the Class Members' PII; and (viii) emotional distress, fear, anxiety, nuisance and annoyance related to the theft and compromise of their PII.

7.      Plaintiffs and Class Members seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and remains at risk due to inadequate data security.

8.      Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II. PARTIES

***Plaintiff Daniel Blanco***

9.      Plaintiff Daniel Blanco is, and at all times relevant has been, a resident and citizen of California, where he intends to remain. Plaintiff received a "Notice of Security" letter, dated April 6, 2021, on or about that date. The letter notified Plaintiff that on July 4, 2021, DialAmerica identified unusual activity on its network. DialAmerica commenced an investigation that determined between February 2, 2021 and July 9, 2021, an unauthorized actor gained access to certain DialAmerica systems and the actor may have viewed and taken data from those systems.[1] The type of data at issue included full names, addresses, and Social Security numbers.[2]  The letter further advised Plaintiff that he should sign up credit monitoring services because his identity was at risk.

10.      Defendant obtained and continues to maintain Plaintiff Daniel Blanco's and Class Members' PII and has a continuing legal duty and obligation to protect that sensitive information from unauthorized access and disclosure. Defendant required the PII from Plaintiff Daniel Blanco. Plaintiff, however, would not have entrusted his PII to Defendant had he known that it would fail to maintain adequate data security. Plaintiff's PII was compromised and disclosed as a result of the Data Breach.

***Plaintiff Rafael Blanco***

11.      Plaintiff Rafael Blanco is, and at all times relevant has been, a resident and citizen of California, where he intends to remain. Plaintiff received a "Notice of Security" letter, dated April 6, 2021, on or about that date. The letter notified Plaintiff that on July 4, 2021, DialAmerica identified unusual activity on its network. DialAmerica commenced an investigation that determined between February 2, 2021 and July 9, 2021, an unauthorized actor gained access to certain DialAmerica systems and the actor may have viewed and taken data from those systems.[3]

---

[1] https://ago.vermont.gov/blog/2022/04/06/dialamerica-marketing-data-breach-notice-to-consumers/?utm_source=rss&utm_medium=rss&utm_campaign=dialamerica-marketing-data-breach-notice-to-consumers.
[2] *Id.*
[3] https://ago.vermont.gov/blog/2022/04/06/dialamerica-marketing-data-breach-notice-to-consumers/?utm_source=rss&utm_medium=rss&utm_campaign=dialamerica-marketing-data-breach-notice-to-consumers.

The type of data at issue included full names, addresses, and Social Security numbers.[4]  The letter further advised Plaintiff that he should sign up credit monitoring services because his identity was at risk.

12.     Defendant obtained and continues to maintain Plaintiff Rafael Blanco's and Class Members' PII and has a continuing legal duty and obligation to protect that sensitive information from unauthorized access and disclosure. Defendant required the PII from Plaintiff Rafael Blanco. Plaintiff, however, would not have entrusted his PII to Defendant had he known that it would fail to maintain adequate data security. Plaintiff's PII was compromised and disclosed as a result of the Data Breach.

***Defendant DialAmerica Marketing, Inc.***

13.     Defendant DialAmerica is a telemarketing and call center outsourcing service provider headquartered at 960 Macarthur Boulevard, Mahwah, New Jersey.[5]

14.     All of Plaintiffs' claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

### III. JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Cal. Code Civ. Proc. § 410.10 and Cal. Bus. & Prof. Code §§ 17203-17204, 17604. This action is brought as a class action on behalf of Plaintiff and the Class members pursuant to Cal. Code Civ. Proc. § 382.

16.     This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in California as Defendant has an office/call center in San Diego.

17.     Venue is proper in this Court pursuant to Cal. Code Civ. Proc. § 395 and § 395.5 because Defendant regularly conducts business in the State of California, Defendant has an office/call center located at 9332 Clairemont Mesa Blvd, San Diego, CA, purposefully availing itself of this Court's jurisdiction and the unlawful acts or omissions giving rise to this action also occurred or arose in this county.

---

[4] *Id.*
[5] https://www.dialamerica.com/corporate/about-us/.

**IV. FACTUAL ALLEGATIONS**

*Background*

18.     Defendant DialAmerica is a telemarketing and call center outsourcing service provider headquartered at 960 Macarthur Boulevard, Mahwah, New Jersey.

19.     Plaintiffs and Class Members were employees of Defendant whose PII was required to be provided, and was in fact provided, to Defendant in conjunction with hiring or during the course of their employment with Defendant. Plaintiffs' and Class Members' PII was required to fill out various forms, including without limitation, employment paperwork and applications, tax documents, various authorizations, other form documents associated with gaining employment at DialAmerica, and government mandated employment documentation.

20.     Plaintiffs and Class Members relied on the sophistication of Defendant and its network to keep their PII confidential and securely maintained, to use this information for business and/or employment purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members demand security to safeguard their PII.

21.     Defendant required the submission of and voluntarily accepted the PII as part of its business and had a duty to adopt reasonable measures to protect the PII of Plaintiffs and Class Members from involuntary disclosure to third parties. DialAmerica has a legal duty to keep employee and consumer PII safe and confidential.

22.     The information held by Defendant in its computer systems and networks included the PII of Plaintiffs and Class Members.

23.     Defendant derived a substantial economic benefit from collecting Plaintiffs' and Class Members' PII.

24.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, DialAmerica assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

25.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

*The Data Breach*

26.     "On July 4, 2021, DialAmerica discovered anomalous activity on its computer network."[6]

27.     According to Defendant, DialAmerica "immediately launched an investigation, with the assistance of third-party cybersecurity specialists, to determine the nature and scope of the event."[7]

28.     DialAmerica's investigation determined that between February 2, 2021, and July 9, 2021, an unauthorized actor gained access to certain DialAmerica systems and that the unauthorized actor viewed and took data from within those systems.[8]

29.     To date, DialAmerica has not revealed the mechanism by which the unauthorized actor first gained access to Defendant's network.

30.     Upon information and belief, the unauthorized actor had access to DialAmerica's systems for over six months, meaning that the unauthorized actor had unfettered and undetected access to Defendant's networks for a considerable period of time prior to DialAmerica becoming aware of the unauthorized access to its computer systems and network.

31.     The investigation commissioned by DialAmerica did not conclude until February 4, 2022, and notice was not sent to victims of the data breach until months after that.[9]  Thus, the victims of this Data Breach, including Plaintiffs and Class Members, were not sent notice of this Data Breach until approximately nine months after DialAmerica first knew about this Data Breach.

32.     Defendant acknowledges that certain files containing personal information accessed or acquired without authorization.

33.     Unsurprisingly, Defendant's investigation could not rule out that the stolen PII has been or will be misused by the hackers.[10]

---

[6] https://ago.vermont.gov/blog/2022/04/06/dialamerica-marketing-data-breach-notice-to-consumers/?utm_source=rss&utm_medium=rss&utm_campaign=dialamerica-marketing-data-breach-notice-to-consumers.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*

34.     The PII compromised in the Data Breach includes Plaintiffs' and Class Members' names, addresses, Social Security numbers, and employer-assigned identifications numbers. [11]

35.     On or around April 6, 2022, Defendant disclosed the Data Breach to the Vermont Attorney General's Office.[12]

36.     DialAmerica first notified its impacted employees and former employees of the incident on or around April 6, 2022, sending written notifications to individuals whose personal information was compromised in the Data Breach.

37.     Plaintiffs' and Class Members' PII was accessed and stolen in the Data Breach.

38.     Plaintiffs further believes their PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

39.     To prevent and detect cyber-attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

---

[11] *Id.*
[12] *Id.*

CLASS ACTION COMPLAINT

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

40.    To prevent and detect cyber-attacks, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

CLASS ACTION COMPLAINT

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[13]

41.   To prevent and detect cyber-attacks attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-Apply latest security updates

-Use threat and vulnerability management

-Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-      Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

-      Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

-      Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-Monitor for adversarial activities

-Hunt for brute force attempts

-Monitor for cleanup of Event Logs

-Analyze logon events;

**Harden infrastructure**

---

[13] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at:* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited Nov. 11, 2021).

CLASS ACTION COMPLAINT

1    -Use Windows Defender Firewall

2    -Enable tamper protection

3    -Enable cloud-delivered protection

4    -    Turn on attack surface reduction rules and [Antimalware Scan Interface] for

5    Office [Visual Basic for Applications].[14]

6    42.    Given that Defendant was storing the PII of Plaintiffs and Class Members,

7    Defendant could and should have implemented all of the above measures to prevent and detect

8    cyber-attacks.

9    43.    The occurrence of the Data Breach indicates that Defendant failed to adequately

10    implement one or more of the above measures to prevent cyber-attacks, resulting in the Data

11    Breach and the exposure of the PII of an undisclosed amount of current and former employees,

12    including Plaintiffs and Class Members.

13    ***Defendant Acquires, Collects, and Stores the PII of Plaintiffs and Class Members***

14    44.    Defendant has historically acquired, collected, and stored the PII of Plaintiffs and

15    Class Members.

16    45.    As part of being an employee of Defendant, Plaintiffs and Class Members, are

17    required to give their sensitive and confidential PII to Defendant. Defendant retains and stores this

18    information and derives a substantial economic benefit from the PII that it collects. But for the

19    collection of Plaintiffs' and Class Members' PII, Defendant would be unable to conduct its

20    business without the current and former employees for the purpose of assisting Defendant with

21    telemarketing and call center services.

22    46.    By obtaining, collecting, and storing the PII of Plaintiffs and Class Members,

23    Defendant assumed legal and equitable duties and knew or should have known that it was

24    responsible for protecting the PII from disclosure.

25

26

27    [14] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

28    (last visited Nov. 11, 2021).

47.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

48.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiffs and Class Members.

49.     Defendant's policies on its website include promises and legal obligations to maintain and protect PII, demonstrating an understanding of the importance of securing PII.[15]

50.     DialAmerica alleges it "is fully committed to protecting the privacy and wishes of its prospects and customers."[16]

51.     Defendant's negligence in safeguarding the PII of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

52.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised and failed to notify those affected for many months.

***Defendant Knew or Should Have Known of the Risk Because the Telemarketing Sector is Particularly Susceptible to Cyber Attacks***

53.     Defendant knew and understood unprotected or exposed PII in the custody of telemarketing and call center companies, such as Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access, as these companies maintain highly sensitive PII of employees and consumers, including Social Security numbers.

***Value of Personally Identifiable Information***

54.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[17]

---

[15] https://www.dialamerica.com/corporate/privacy-policy/
[16] *Id.*
[17] 17 C.F.R. § 248.201 (2013).

The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[18]

55.   The PII of individuals remains of high value to criminals, as evidenced by the prices the criminals will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[19] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[20] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[21]

56.   Social Security numbers, for example, are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone

---

[18] *Id.*

[19] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Jan. 19, 2022).

[20] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/  (last visited Jan 19, 2022).

[21] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Jan. 19, 2022).

illegally using your Social Security number and assuming your identity can cause a lot of problems.[22]

57.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

58.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[23]

59.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—one's Social Security number.

60.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[24]

61.     Among other forms of fraud, identity thieves may use Social Security numbers to obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

---

[22] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Jan. 19, 2022).

[23] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Jan. 19, 2022).

[24] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Nov. 11, 2021).

CLASS ACTION COMPLAINT

62.     The fraudulent activity resulting from the Data Breach may not come to light for years.

63.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[25]

64.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if Defendant's data security system and network was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

65.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

66.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to potentially thousands of individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

67.     In the breach notification letter, Defendant made an offer of twenty-four (24) months of credit and identity monitoring services. This is wholly inadequate to compensate Plaintiffs and Class Members as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and

---

[25] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Jan. 19, 2022).

financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' PII.

68.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

69.     The ramifications of Defendant's failure to keep secure the PII of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

***Defendant Violated the FTC Act***

70.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

71.     Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Nationwide Class.

***Plaintiff Daniel Blanco's Experience***

72.     Plaintiff was required to provide and did provide his PII to Defendant during the course of his employment with Defendant.  The PII included his name, address, date of birth, Social Security Numbers, driver's license number, telephone number, and other financial and tax information.

73.     To date, DialAmerica has done next to nothing to adequately protect Plaintiffs and Class Members, or to compensate them for their injuries sustained in this Data Breach.

74.     Defendant's data breach notice letter downplays the theft of Plaintiffs' and Class Members PII, when the facts demonstrate that the PII was targeted, accessed, and exfiltrated in a

criminal cyberattack. The fraud and identity monitoring services offered by Defendant are only for two years, and it places the burden squarely on Plaintiffs and Class Members by requiring them to expend time signing up for the service and addressing timely issues when the service number for enrollment does not work properly.

75.     Plaintiffs and Class Members have been further damaged by the compromise of their PII.

76.     Plaintiff Daniel Blanco's PII was compromised in the Data Breach and is now in the hands of cybercriminals who illegally accessed DialAmerica's network for the specific purpose of targeting the PII.  Indeed, following the Data Breach, Plaintiff received a notification that his information was found on the Dark Web.

77.     Plaintiff Daniel Blanco typically takes measures to protect his PII and is very careful about sharing his PII. Plaintiff has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

78.     As a result of the Data Breach, Plaintiffs suffered loss of time and spent and continues to spend considerable amounts of time on issues related to this Data Breach. Indeed, in its Notice of Security Incident Letter, Defendant directed Plaintiffs to spend time in order to mitigate against their losses.  As a result of that directive, and in an attempt to mitigate his losses, Plaintiff Daniel Blanco has spent hours monitoring accounts and credit scores, changing passwords on his accounts, and he has sustained emotional distress. This is time that was lost and unproductive and took away from other activities and duties.

79.     Plaintiffs also suffered actual injury in the form of damages to and diminution in the value of their PII—a form of intangible property that they entrusted to Defendant for the purpose of obtaining employment from Defendant, which was compromised in and as a result of the Data Breach.

80.     Plaintiffs suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of their privacy.

81.     Plaintiffs suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their PII, especially their Social Security Number, being placed in the hands of criminals.

82.     Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Defendant required the PII from Plaintiffs when they began employment with Defendant. Plaintiff, however, would not have entrusted their PII to Defendant had they known that it would fail to maintain adequate data security. Plaintiffs' PII was compromised and disclosed as a result of the Data Breach.

83.     As a result of the Data Breach, Plaintiff Daniel Blanco anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiffs are at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

***Plaintiff Rafael Blanco's Experience***

84.     Plaintiff was required to provide and did provide his PII to Defendant during the course of his employment with Defendant.  The PII included his name, address, date of birth, Social Security Numbers, driver's license number, telephone number, and other financial and tax information.

85.     To date, DialAmerica has done next to nothing to adequately protect Plaintiffs and Class Members, or to compensate them for their injuries sustained in this Data Breach.

86.     Defendant's data breach notice letter downplays the theft of Plaintiffs' and Class Members PII, when the facts demonstrate that the PII was targeted, accessed, and exfiltrated in a criminal cyberattack. The fraud and identity monitoring services offered by Defendant are only for two years, and it places the burden squarely on Plaintiffs and Class Members by requiring them to expend time signing up for the service and addressing timely issues when the service number for enrollment does not work properly.

87.     Plaintiffs and Class Members have been further damaged by the compromise of their PII.

88.     Plaintiff Rafael Blanco's PII was compromised in the Data Breach and is now in the hands of cybercriminals who illegally accessed DialAmerica's network for the specific purpose of targeting the PII.  In fact, in May 2022, Plaintiff Rafael Blanco received a notification that his information was found on the Dark Web.

89.     Following the Data Breach, Plaintiff Rafael Blanco purchased identity theft protection, which costs him approximately $15 per month.  Plaintiff Rafael Blanco would not have purchased this service if not for the Data Breach.

90.     Plaintiff Rafael Blanco typically takes measures to protect his PII and is very careful about sharing his PII. Plaintiff has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

91.     As a result of the Data Breach, Plaintiffs suffered loss of time and spent and continues to spend considerable amounts of time on issues related to this Data Breach. Indeed, in its Notice of Security Incident Letter, Defendant directed Plaintiffs to spend time in order to mitigate against their losses.  As a result of that directive, and in an attempt to mitigate his losses, Plaintiff Rafael Blanco has spent hours monitoring accounts and credit scores and has sustained emotional distress. This is time that was lost and unproductive and took away from other activities and duties.

92.     Plaintiffs also suffered actual injury in the form of damages to and diminution in the value of their PII—a form of intangible property that they entrusted to Defendant for the purpose of obtaining employment from Defendant, which was compromised in and as a result of the Data Breach.

93.     Plaintiffs suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of their privacy.

94.     Plaintiffs suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their PII, especially their Social Security Number, being placed in the hands of criminals.

95.     Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Defendant

required the PII from Plaintiffs when they began employment with Defendant. Plaintiff, however, would not have entrusted their PII to Defendant had they known that it would fail to maintain adequate data security. Plaintiffs' PII was compromised and disclosed as a result of the Data Breach.

96.     As a result of the Data Breach, Plaintiff Rafael Blanco anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiffs are at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V. CLASS ALLEGATIONS

97.     Plaintiffs bring this suit on behalf of themselves and the following classes/subclass(es) (collectively, the "Class") of similarly situated individuals under Cal. Code Civ. Proc. § 382 and Cal. Civ. Code § 1781, preliminarily defined as:

**Nationwide Class:**

All persons DialAmerica Marketing, Inc. identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach.

**California Subclass:**

All persons within the State of California that DialAmerica Marketing, Inc. identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach.

98.     Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

99.     The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, reports indicate that thousands of individuals had their PII compromised in this Data Breach. The identities

1    of Class Members are ascertainable through DialAmerica's records, Class Members' records,

2    publication notice, self-identification, and other means.

3        100.   There are questions of law and fact common to the Class, which predominate over

4    any questions affecting only individual Class Members. These common questions of law and fact

5    include, without limitation:

6            a.   Whether DialAmerica unlawfully used, maintained, lost, or disclosed

7                 Plaintiff's and Class Members' PII;

8            b.   Whether DialAmerica failed to implement and maintain reasonable

9                 security procedures and practices appropriate to the nature and scope of

10                the information compromised in the Data Breach;

11           c.   Whether DialAmerica data security systems prior to and during the Data

12                Breach complied with applicable data security laws and regulations;

13           d.   Whether DialAmerica data security systems prior to and during the Data

14                Breach were consistent with industry standards;

15           e.   Whether DialAmerica owed a duty to Class Members to safeguard their

16                PII;

17           f.   Whether DialAmerica breached its duty to Class Members to safeguard

18                their PII;

19           g.   Whether computer hackers obtained Class Members' PII in the Data

20                Breach;

21           h.   Whether DialAmerica knew or should have known that its data security

22                systems and monitoring processes were deficient;

23           i.   Whether Plaintiffs and Class Members suffered legally cognizable

24                damages as a result of DialAmerica's misconduct;

25           j.   Whether DialAmerica's conduct was negligent;

26           k.   Whether DialAmerica's conduct was *per se* negligent, and;

27           l.   Whether Plaintiffs and Class Members are entitled to damages, civil

28                penalties, punitive damages, and/or injunctive relief.

101.    Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class member, was compromised in the Data Breach.

102.    Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel is competent and experienced in litigating Class actions, including data privacy litigation of this kind.

103.    DialAmerica has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

104.    A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for DialAmerica. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

105.    DialAmerica has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

106.    Finally, all members of the proposed Class are readily ascertainable. DialAmerica has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by DialAmerica.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Nationwide Class)**

107.    Plaintiffs incorporate by reference all other allegations in the Complaint as if fully set forth herein.

108.    DialAmerica knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

109.    DialAmerica had a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' PII.

110.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

111.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

112.    DialAmerica had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair. . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

113.    DialAmerica, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' PII within DialAmerica's possession.

114.   DialAmerica, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiffs' and Class Members' PII.

115.   DialAmerica, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiffs and Class Members that the PII within DialAmerica s' possession might have been compromised and precisely the type of information compromised.

116.   DialAmerica's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' PII to be compromised.

117.   As a result of DialAmerica's ongoing failure to notify Plaintiffs and Class Members regarding the type of PII has been compromised, Plaintiffs and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

118.   DialAmerica's breaches of duty caused Plaintiffs and Class Members to suffer from identity theft, loss of time and money to monitor their finances for fraud, and loss of control over their PII.

119.   As a result of DialAmerica's negligence and breach of duties, Plaintiffs and Class Members face a substantial and imminent risk of harm in that their PII, which is still in the possession of third parties, will be used for fraudulent purposes.

120.   Plaintiffs seek the award of actual damages on behalf of themselves and the Class.

121.   In failing to secure Plaintiffs' and Class Members' PII and promptly notifying them of the Data Breach, DialAmerica is guilty of oppression, fraud, or malice, in that DialAmerica acted or failed to act with a willful and conscious disregard of Plaintiffs' and Class Members' rights. Plaintiffs, therefore, in addition to seeking actual damages, seek punitive damages on behalf of themselves and the Class.

122.   Plaintiffs seek injunctive relief on behalf of the Class in the form of an order compelling DialAmerica to institute appropriate data collection and safeguarding methods and policies with regard to patient information.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

123.    Plaintiffs incorporate by reference all other allegations in the Complaint as if fully set forth herein.

124.    Plaintiffs and Class Members were required to provide their PII to Defendant as a condition of employment or use of Defendant's services.

125.    Plaintiffs and Class Members disclosed their PII in exchange for employment, along with Defendant's promise to protect their PII from unauthorized disclosure.

126.    In its written privacy policies, Defendant DialAmerica expressly promised Plaintiffs and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

127.    Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' PII would remain protected.

128.    There was a meeting of the minds and an implied contractual agreement between Plaintiffs and Class Members and the Defendant, under which Plaintiffs and Class Members would provide their PII in exchange for Defendant's obligations to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

129.    When Plaintiffs and Class Members provided their PII to Defendant DialAmerica as a condition of obtaining employment they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

130.    Defendant solicited, invited, and then required Class Members to provide their PII as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their PII to Defendant.

131.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

132.    Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure. Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

133.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

134.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their PII.

135.    As a direct and proximate result of Defendant breaches of the implied contracts, Class Members sustained damages as alleged herein.

136.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

137.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

138.    Plaintiffs incorporates by reference all other allegations in the Complaint as if fully set forth herein.

139.    This claim is plead in the alternative to the Second Cause of Action for breach of implied contract.

140.    Defendant benefited from receiving Plaintiffs' and Class Members' PII by its ability to retain and use that information for its own benefit. Defendant understood this benefit.

141.    Defendant also understood and appreciated that Plaintiffs' and Class Members' PII was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

142.    Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of purchasing services from Defendant, and in connection thereto, by providing their PII to Defendant with the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures. Specifically, they were required to provide Defendant with their PII. In exchange, Plaintiffs and Class members should have received adequate protection and data security for such PII held by Defendant.

143.    Defendant knew Plaintiffs and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiffs and Class Members for business purposes.

144.    Defendant failed to provide reasonable security, safeguards, and protections to the PII of Plaintiffs and Class Members.

145.    Under the principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures mandated by industry standards.

146.    Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

147.    Defendant's enrichment at the expense of Plaintiffs and Class Members is and was unjust.

148.    As a result of Defendant's wrongful conduct, as alleged above, Plaintiffs and the Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

///
///
///
///

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Nationwide Class)**

149.    Plaintiffs incorporates by reference all other allegations in the Complaint as if fully set forth herein.

150.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendant of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

151.    Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect PII and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

152.    Defendant's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence per se.

153.    The harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

154.    As a direct and proximate result of Defendant DialAmerica's negligence, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports; expenses and time spent

initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

### FIFTH CAUSE OF ACTION
**Unfair Business Practices**
**(Cal. Bus. & Prof. Code, § 17200, *et seq.*)**
**(On Behalf of Plaintiffs and the California Subclass)**

155.    Plaintiffs incorporates by reference all other allegations in the Complaint as if fully set forth herein.

156.    Defendant has engaged in unfair competition within the meaning of California Business & Professions Code §§17200, *et seq.*, because Defendant's conduct is unlawful, unfair and/or fraudulent, as herein alleged.

157.    Plaintiffs, the California Subclass Members, and Defendant are each a "person" or "persons" within the meaning of § 17201 of the California Unfair Competition Law ("UCL").

158.    The knowing conduct of Defendant, as alleged herein, constitutes an unlawful and/or fraudulent business practice, as set forth in California Business & Professions Code §§17200-17208. Specifically, Defendant conducted business activities while failing to comply with the legal mandates cited herein. Such violations include, but are not necessarily limited to:

      a.   failure to maintain adequate computer systems and data security practices to safeguard PII;

      b.   failure to disclose that its computer systems and data security practices were inadequate to safeguard PII from theft;

      c.   failure to timely and accurately disclose the Data Breach to Plaintiffs Daniel Blanco and Rafael Blanco and California Subclass Members; continued acceptance of PII and storage of other personal information after Defendant knew or should have known of the security vulnerabilities of the systems that were exploited in the Data Breach; and

      d.   continued acceptance of PII and storage of other personal information after Defendant knew or should have known of the Data Breach and before they allegedly remediated the Data Breach.

159.     Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the PII of Plaintiffs and California Subclass Members, deter hackers, and detect a breach within a reasonable time and that the risk of a data breach was highly likely.

160.     In engaging in these unlawful business practices, Defendant has enjoyed an advantage over its competition and a resultant disadvantage to the public and California Subclass Members.

161.     Defendant's knowing failure to adopt policies in accordance with and/or adhere to these laws, all of which are binding upon and burdensome to Defendant's competitors, engenders an unfair competitive advantage for Defendant, thereby constituting an unfair business practice, as set forth in California Business & Professions Code §§17200-17208.

162.     Defendant has clearly established a policy of accepting a certain amount of collateral damage, as represented by the damages to Plaintiffs Daniel Blanco and Rafael Blanco and California Subclass Members herein alleged, as incidental to its business operations, rather than accept the alternative costs of full compliance with fair, lawful and honest business practices ordinarily borne by responsible competitors of Defendant and as set forth in legislation and the judicial record.

163.     The UCL is, by its express terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes and/or common law remedies, such as those alleged in the other causes of action of this Complaint. *See* Cal. Bus. & Prof. Code § 17205.

164.     Plaintiffs and California Subclass Members request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and California Subclass Members any money Defendant acquired by unfair competition, including restitution and/or equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, and the costs of prosecuting this class action, as well as any and all other relief that may be available at law or equity.

165.    Absent injunctive relief, Plaintiffs and Class Members are under continued threat of future harm. Defendant maintains their data and has not identified any specific steps it has taken to resolve the data security issues that allowed the data breach to occur. Accordingly, Plaintiffs and Class Members remain in the dark about what steps are being taken to secure their data, let alone that Defendant is implementing all practices and processes to secure their data. The only way they can be confident in the future security of this data is for this Court to order Defendant to take the specific steps necessary to install a robust cybersecurity protocol sufficient to adequately secure their data.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A.    For an order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent each such Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.   requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

    iii.  requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can

provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

v.   prohibiting Defendant from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

vi.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.   requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.   requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.   requiring Defendant to conduct regular database scanning and securing checks;

xi.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal

identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.   requiring Defendant to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demands that this matter be tried before a jury.

Dated: June 7, 2022        Respectfully submitted,

**FELL LAW, P.C.**
Bibianne U. Fell

**FEDERMAN & SHERWOOD**
William B. Federman
(*pro hac vice* application forthcoming)

**MURPHY LAW FIRM**
A. Brooke Murphy
(*pro hac vice* application forthcoming)

*Counsel for Plaintiffs and the Class*